UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| LAMARR T. CRITTENDEN, | ) |
| Plaintiff, | ) |
| v. | ) No. 1:18-cv-02897-JPH-MPB |
| BRUCE D. IPPELL, WEXFORD MEDICAL SERVICES OF INDIANA L.L.C., H. DAVIS, STACEY SCOTT, Dr. CARL KUENZLI, | ) |
| Defendants. | ) |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

For the reasons explained in this Order, the defendants' motion for summary judgment, dkt. [150], is **granted**.

**I. Background**

Plaintiff Lamarr Crittenden is currently incarcerated at New Castle Correctional Facility ("NCCF"). The claims presented in his amended complaint were summarized in the Court's screening order:

> Generally he alleges that each of the defendants ignored his need for orthotic insoles and medication for his pain in his back and feet. He also contends that the defendants ignored his need for a bottom bunk pass and/or a ladder system to allow him to climb down from a top bunk.

*See* dkt. 65 at 2.

The Court previously granted defendant Michael Smith's motion for summary judgment and acknowledged the parties' stipulation of dismissal of defendants M. Strobel and Jennifer French. Dkt. 180; 183. In response to the motion for summary judgment, Mr. Crittenden conceded

1

that Stacey Scott and Dr. Carl Kuenzli "should be awarded summary judgment and dismissed from the case," dkt. 171 at 7, so the Court grants summary judgment to Dr. Kuenzli and Ms. Scott.

The remaining defendants are Dr. Bruce Ippel, Heather Davis, and Wexford Medical Services of Indiana ("Wexford"). Mr. Crittenden alleges that Dr. Ippel and Ms. Davis were deliberately indifferent to his medical condition and that Wexford violated the Eighth Amendment by failing to have a full-time doctor on call at NCCF and maintaining an unconstitutional policy regarding bottom bunk pass requirements. Dkt. 14.

## II. Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the

suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trs. of Ind. Univ.,* 870 F.3d 562, 573-74 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson*, 477 U.S. at 255.

### III. Discussion

#### A. Material Facts

Mr. Crittenden, at all times relevant to his complaint, was an inmate incarcerated at NCCF. He worked in dietary for a period of approximately thirteen months, until late 2018. Dkt. 151-5 at 10-11. He has also worked dorm jobs that required cleaning, mopping, and sweeping. *Id.* at 11.

### 1. Dr. Ippel

At all times relevant to the plaintiff's complaint, Dr. Ippel was a physician licensed to practice medicine in the State of Indiana employed as a physician at NCCF by Wexford, dkt. 151-1, ¶¶ 1-2. Dr. Ippel saw Mr. Crittenden twice, first on November 28, 2017, and then on March 14, 2018.

Dr. Ippel saw Mr. Crittenden on November 28, 2017, after he submitted a healthcare request form related to foot and back pain. Dkt. 151-1, ¶ 5; dkt. 151-6 at 8-10. Mr. Crittenden told Dr. Ippel that he worked in the kitchen, a position that required a lot of walking, which had increased his foot pain over the previous few months. *Id.* Dr. Ippel assessed his foot and noted he had a "relatively small arch, but the rest of his foot appeared benign to inspection, palpation and manipulation." *Id.* Mr. Crittenden reported he was taking Ibuprofen but was otherwise in good health. *Id.* Mr. Crittenden said he wore Dr. Scholl's medical insoles in the past, but they were not working. Dkt. 151-5 at 16. Dr. Ippel's treatment plan was to order meloxicam, an anti-inflammatory medication, and he discussed with Mr. Crittenden that he could "attempt to create a small arch out of materials in his cell simply to see if an arch support would provide any additional relief." Dkt. 151-1, ¶ 5; dkt. 151-6 at 8-10. Dr. Ippel's plan included requesting medical insoles, and he informed Mr. Crittenden that additional treatment would depend on how the insoles and pain medication worked. *Id.*; *see also* dkt. 151-5 at 44. Mr. Crittenden testified that he never tried to make arch supports in his cell. Dkt. 151-5 at 46.

Dr. Ippel saw Mr. Crittenden for the second time on March 14, 2018, and Mr. Crittenden complained of pain with walking and that pain was slowly worsening. Dkt. 151-1; ¶ 6; dkt. 151-6 at 6-7. Mr. Crittenden told Dr. Ippel that he had not received the medical insoles that were ordered. Dkt. 151-1, ¶ 6; dkt. 151-5 at 48-49. According to the medical record, Mr. Crittenden told Dr. Ippel

4

he preferred orthotic arch supports, rather than insoles, because his current insoles from the commissary and the meloxicam were not providing relief. Dkt. 151-6 at 6. Dr. Ippel said he would submit a request for special orthotic arch supports that are not available through commissary, based on his belief that the supports would be beneficial. Dkt. 151-1, ¶ 6; dkt. 151-6 at 6-7.

In his affidavit, Dr. Ippel stated he did not know why Mr. Crittenden's medical insoles were not provided after his November 2017 visit. Dkt. 151-1, ¶ 7. Dr. Ippel explained that he often makes orders for medical supplies or recommendations to the Regional Medical Director but is not involved in the process of physically ordering or dispensing such supplies. *Id.* He relies upon nursing staff to review the entries, note the orders, and take the steps to order the designated treatment for the patient. *Id.*

A request for Mr. Crittenden's special orthotic arch supports was made by the medical office to Wexford on April 19, 2018. Dkt. 151-1, ¶ 8; dkt. 151-6 at 3-5. The medical record indicates that Mr. Crittenden's arch supports were being ordered to likely provide benefit for his hyper mobile flat arches. Dkt. 151-6 at 4. To Dr. Ippel's knowledge, Wexford approved the request and the supports were dispensed in June 2018. Dkt. 151-1, ¶ 9. Beyond his second visit with Mr. Crittenden, Dr. Ippel did not conduct any further evaluation of the plaintiff. Dkt. 151-1, ¶ 10.

### 2. Nurse Davis

At all times relevant to the plaintiff's complaint, Heather Davis was a nurse licensed to practice in the State of Indiana employed as a nurse at NCCF by Wexford. Dkt. 151-2, ¶¶ 1-2. Her responsibilities included reviewing and triaging written healthcare requests from patients. Dkt. 151-2, ¶ 4. Ms. Davis responded to two of Mr. Crittenden's healthcare requests in October and November of 2017. *Id.*, ¶¶ 4-5.

Mr. Crittenden's October 15, 2017 healthcare request asked to be able to speak with a doctor about being put on a special diet because of his weight; it does not seek an appointment for a foot condition. Dkt. 151-6 at 12. Regardless, Ms. Davis responded to this request within two days, informing Mr. Crittenden that the diet had been taken away due to Mr. Crittenden's own misuse, and that he could submit another health care request and be seen on nurse sick call if he had any symptoms or issues going forward. *Id.*; Dkt. 151-2, ¶ 4.

Mr. Crittenden's November 4, 2017 healthcare request stated:

> I have been put in to see a doctor twice in the last month and a half, I have already been triage, so do not charge me for this request. This is a means of requesting to see Doctor before a formal grievance is filed. Please put me in to see the Doctor. Thank you.

Dkt. 151-6 at 13. Again, Ms. Davis responded to Mr. Crittenden's request within two days, informing him that she had reviewed his chart and he had not been seen twice for the same unresolved issue. *Id.* She gave him instructions to resubmit a form with further explanation. *Id.* By this time, Ms. Davis noted Mr. Crittenden had already been referred to see a doctor. *Id.* at 11.

Ms. Davis attested that neither of these healthcare requests that she reviewed in the fall of 2017 indicated Mr. Crittenden "had any serious, significant, or emergent medical condition that required immediate intervention." Dkt. 151-2, ¶ 9.

### 3. Wexford

Mr. Crittenden also asserted claims against Wexford regarding its medical low bunk policy and its staffing policy. Dr. Ippel attested that Wexford "maintained a formulary for which patients were assessed to determine need for a medical low bunk permit." Dkt. 151-1, ¶ 21. If patients fit the criteria of the low bunk formulary, they are given a low bunk permit. *Id.* Dr. Ippel had the ability to order a low bunk permit if he believed a patient "absolutely required" one but most of these permits were granted based on the formulary, which "covered the overwhelming majority of

6

patients that would require a medical low bunk permit." *Id.* Because Mr. Crittenden was able to ambulate easily and was active with his job, Dr. Ippel did not find that his foot and back pain were of a degree that required a medical low bunk pass. *Id.*, ¶ 20.

### B. Eighth Amendment Deliberate Indifference Claims

At all times relevant to Mr. Crittenden's claims, he was a convicted inmate. Accordingly, his treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."). To establish an Eighth Amendment claim for deliberate indifference to serious medical needs, "the plaintiff must prove that he suffered from '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). "[C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that the plaintiff was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (internal quotations omitted).

Mr. Crittenden's medical records indicate that he has hyper mobile flat arches (fallen arches or flat feet). Dkt. 151-6 at 6. The defendants argue that Mr. Crittenden's foot condition is not an objectively serious medical need under the Eighth Amendment, dkt. 152 at 18, but as defendants concede, there is no specific Seventh Circuit case law "that clearly identifies whether flat feet can amount to a serious medical need[.]" Dkt. 177 at 7. The Court need not resolve whether Mr. Crittenden's condition amounted to a serious medical need because no reasonable jury could

conclude that either Dr. Ippel or Nurse Davis were deliberately indifferent to Mr. Crittenden's medical condition.

### 1. Dr. Ippel

Mr. Crittenden alleges that Dr. Ippel was deliberately indifferent to his medical condition because he delayed his treatment of medical insoles and later his request for orthotic arch supports. Dr. Ippel stated he ordered both medical insoles and pain medication for Mr. Crittenden after the initial visit. Dkt. 151-1, ¶ 13. After the subsequent visit, Dr. Ippel requested orthotic arch supports as opposed to medical insoles pursuant to Mr. Crittenden's specific request for them. *Id.* These were obtained and provided to Mr. Crittenden. *Id.* Though Dr. Ippel had initially requested the medical insoles in November 2017, he had no reason to believe they were not ordered and was not made aware of the issue until Mr. Crittenden returned for a follow up visit months later. *Id.*, ¶¶ 14-16.

Based upon his review of the records, Dr. Ippel stated that, "there was an unfortunate breakdown in the process of initially ordering the medical insoles in November 2017" and was unaware there was an issue "for which [he] could take steps to address." *Id.*, ¶¶ 14-15. Mr. Crittenden's own exhibits show that he did not follow up about the insoles until he submitted the healthcare request forms dated February 13, 2018 and March 11, 2018. Dkt. 172-4; dkt. 172-5. In a March 14, 2018 grievance form, written the same day that the plaintiff saw Dr. Ippel for the second visit, Mr. Crittenden wrote that "[Dr. Ippel] checked his computer and showed me that he had put in [the] request twice to have them ordered but twice they had not been ordered" but could not tell him how or why that happened. Dkt. 172-6 at 1. At this time the treatment plan progressed to the utilization of orthotic arch supports rather than insoles – either at the plaintiff's request or Dr. Ippel's recommendation, which is disputed in the record. However, this does not create a

8

genuine issue of material fact as ultimately the orthotic arch supports were ordered and dispensed to the plaintiff in June 2018, and Mr. Crittenden testified that these supports did provide some partial relief. Dkt. 151-5 at 55-56.

Mr. Crittenden argues that the orthotic arch supports were delayed, evidenced by a level 1 grievance received on April 4, 2018 and responded to on April 25, 2018. Dkt. 172-7. Mr. Crittenden was informed that orthotic arch supports had to be approved though Utilization Management and would be ordered with the routine medical supplies, which was completed every two weeks. *Id.* On June 18, 2018, the formal appeal response to Mr. Crittenden's grievance stated the provider had made notations regarding the November 2017 medical insoles but nothing was ordered, mentioned orthotic arch supports in March 2018 and nothing was ordered, and that forms were submitted but nothing indicated that the arch supports had been received. *Id.* The medical record documents that these arch supports were ordered on April 19, 2018. Dkt. 151-6 at 3.

Mr. Crittenden contends that there are contradictory stories regarding who ordered what and when—"The doctor says he ordered orthotic insoles early in the process, which would necessarily mean that the staff ignored his order. The staff say the opposite, namely that the doctor ignored his own diagnosis and prescription and did not put in an order for the medical treatment even after deeming it appropriate on two separate occasions." Dkt. 171 at 1-2. Mr. Crittenden argues that this contradiction is a factual dispute at the heart of his claims. *Id.*

But the medical notes and Mr. Crittenden's own statements show that Dr. Ippel attempted to have these orders placed. *See* dkt. 151-6 at 8 (medical record); *see also* dkt. 172-6 at 1 (Offender Grievance Form on March 19, 2018 stated Dr. Ippel checked the computer and showed Mr. Crittenden he put in two requests for medical insoles.). Mr. Crittenden has not designated evidence to support a finding that Dr. Ippel did not order the insoles. Moreover, when Dr. Ippel learned of

9

the issue with the medical insoles, he requested more advanced treatment of the use of orthotic arch supports. Dkt. 151-1, ¶ 6; dkt. 151-6 at 3-7.

But even if Dr. Ippel failed to place an order for the medical insoles or orthotic arch supports, this fact would not support a deliberate indifference claim. Deliberate indifference requires "more than negligence and approaches intentional wrongdoing." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (internal citation omitted). Medical malpractice, negligence, or even gross negligence does not equate to deliberate indifference. *See Dunigan ex rel. Nyman v. Winnebago Cty.*, 165 F.3d 587, 592 (7th Cir. 1999). "Even objective recklessness—failing to act in the face of an unjustifiably high risk that it is so obvious that it *should* be known—is insufficient to make out a claim." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). Here, Dr. Ippel did not see Mr. Crittenden after the March 14, 2018 visit, and Mr. Crittenden received the orthotic arch supports several months later in June. Dkt. 151-1; dkt. 151-6; dkt. 151-5 at 55. Mr. Crittenden has presented no evidence that Dr. Ippel deliberately delayed his receipt of his medical supplies or treatment. Moreover, Dr. Ippel did not have any further visits with Mr. Crittenden after he received his orthotic arch supports in June 2018, and Mr. Crittenden admitted the arch supports provided partial relief. Dkt. 151-5 at 55-56. And when Mr. Crittenden was seen by another provider the following month, he was provided Naproxen and advised the use of stretches. Dkt. 151-6 at 1. That provider also noted that the plaintiff ambulates well and that there were no bony changes. *Id.*

In his response, Mr. Crittenden declared that after he tried insoles or arch supports, Dr. Ippel told him he would send him to a foot specialist if his pain persisted. Dkt. 172-2. To date, he claims that he has not had an x-ray done to reveal any potential deformities in his bone structure, and he believes that the strong pains he still has in his lower back and arches "comes from not having the proper orthotic arch supports." *Id.* But a prisoner cannot demand specific care, nor is

he entitled to the best care possible. *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006); *Boyce v. Moore*, 314 F.3d at 888-89; *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999). Mere dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient. *See Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996); *Johnson*, 433 F.3d at 1013.

No reasonable fact-finder could conclude that Dr. Ippel was deliberately indifferent to Mr. Crittenden's medical condition. Accordingly, he is entitled to summary judgment.

### 2. Heather Davis

Mr. Crittenden claims that Ms. Davis was deliberately indifferent because she did not review his medical record and failed to schedule him to see Dr. Ippel earlier than November 2017. Dkt. 151-5 at 20-21, 43. In his response, he does not designate evidence showing, or even argue, that Ms. Davis ignored his need for medical insoles or medication. Therefore, the Court only assesses whether she was deliberately indifferent for failing to schedule an appointment.

Mr. Crittenden's healthcare requests submitted on October 15, 2017 and November 4, 2017, were reviewed by Ms. Davis. Dkt. 151-6 at 12-13. In these requests, Mr. Crittenden did not request to see a doctor in relation to his foot pain. *Id.* Mr. Crittenden's October 2017 request was to speak to a doctor about receiving a special diet to lose weight. *Id.* at 12. In his November 2017 request, Mr. Crittenden failed to identify any medical issues or symptoms to support his request to see a doctor. *Id.* at 13.

Ms. Davis promptly reviewed and responded to both of these requests, which were unrelated to his claims regarding his foot condition, within two days. *Id.* Ms. Davis' October 2017 response informed Mr. Crittenden that his misuse of a special diet was the reason for it being discontinued and that he could submit another healthcare request and be seen on nurse sick call for any further symptoms or issues regarding the request. *Id.* at 12. Ms. Davis' November 2017

response indicated that she had reviewed his medical chart, determined that he had not been seen twice for the same unresolved issue, stated that no issue was listed on his healthcare request form, and instructed Mr. Crittenden to submit a health care request with specific symptoms and issues. *Id.* at 13. Ms. Davis attested that by the time of this November 2017 request that she received and responded to, he "had already been recently referred to see the provider" by another nurse. Dkt. 151-2, ¶ 5.

Ms. Davis did not deny Mr. Crittenden access to seeing a provider; rather, Ms. Davis reasonably responded to his requests as Mr. Crittenden had written and submitted them, thus her responses did not ignore his medical needs. Mr. Crittenden has not shown that Ms. Davis was aware of a serious risk to his health and disregarded it. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (citing *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). No reasonable fact-finder could conclude that Heather Davis was deliberately indifferent to Mr. Crittenden's foot condition. Accordingly, she is entitled to summary judgment.

### C. *Monell* Claim Against Wexford

Because Wexford acts under color of state law by contracting to perform a government function, *i.e.,* providing healthcare services to inmates, it is treated as a municipal entity for purposes of section 1983 claims. *See Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 766 n.6 (7th Cir. 2002). "[M]unicipal governments cannot be held liable for damages under 42 U.S.C. § 1983 on a theory of *respondeat superior* for constitutional violations committed by their employees. They can, however, be held liable for unconstitutional municipal policies or customs." *Simpson v. Brown Cty.*, 860 F.3d 1001, 1005-6 (7th Cir. 2017) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690-91 (1978)).

For Mr. Crittenden to succeed on his policy claim, he must show that Wexford had a policy or custom that caused a constitutional injury. If there is no constitutional injury, there can be no policy claim. *See Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007). "The critical question under *Monell* … is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (citing *Monell,* 436 U.S. 658 (1978) and *Los Angeles Cty. v. Humphries,* 562 U.S. 29 (2010)). "Either the content of an official policy, a decision by a final decisionmaker, or evidence of custom will suffice." *Id.*

Mr. Crittenden argues that he waited roughly 90 days "because of a backlog of offenders waiting to see the doctor." Dkt. 171 at 3. The medical record indicates that Mr. Crittenden had an August 26, 2017 sick call visit regarding foot pain and his arches, and he was triaged and referred to a provider. Dkt. 172-1. As the medical notes indicate, Mr. Crittenden was requesting arch support, had cushioned insoles that did not work, and was instructed to request sick call if his symptoms did not subside or if they became more severe. *Id.* Mr. Crittenden submitted healthcare request forms, which were unrelated or incomplete, between this triage and his initial evaluation with Dr. Ippel. Ms. Davis responded to these requests within a few days to request more information that Mr. Crittenden ultimately did not provide to her.

Mr. Crittenden submits his own declaration that he waited for three months to see the doctor due to a backlog of offenders. Dkt. 172-2. He additionally includes similar declarations from four other offenders—none of which had his same condition. *Id.* Any potential backlog is a condition of the facility and is not a policy, practice, or custom. Mr. Crittenden has pointed to no policy or practice showing that Wexford's staffing patterns or staffing decisions resulted in delay or other harm. Rather, Mr. Crittenden only makes assumptions that there were such policies and practices.

Dkt. 151-5 at 32 (plaintiff responded "I assume that's the case based on my care. That's the only thing one could assume if they did not see a doctor for 90 days."). Moreover, Mr. Crittenden testified that during the 90 days before he saw Dr. Ippel, he was able to and did buy over the counter pain medication from commissary, and the record supports that he had over the counter insoles as well. Dkt. 151-5 at 28.

The plaintiff's challenge to Wexford's bottom bunk formulary is also unsuccessful. The record indicates Mr. Crittenden inquired about a bottom bunk pass on May 19, 2018, two months after Dr. Ippel last saw him. Mr. Crittenden admitted that no doctor at NCCF had ever issued him a bottom bunk pass and that he was told he did not meet the criteria. Dkt. 151-5 at 35-36 ("They said I don't fit the Wexford criteria under the guideline. And even being the situation that it may be, if I were to request for you to have a bottom bunk pass, Wexford would not approve it because you don't meet the criteria.").

Dr. Ippel described the Wexford formulary as one that afforded the provider discretion to issue a low bunk permit if the patient "absolutely" needed one. Dkt. 151-1, ¶ 21. Dr. Ippel "was never of the opinion that Mr. Crittenden required a medical low bunk permit" as he "always had the ability to easily ambulate and was very active, specifically with his job." *Id.* ¶ 20. The medical record does not indicate that any other provider shared a different opinion regarding the plaintiff's need for the accommodation. Mr. Crittenden may have believed he should have qualified for a bottom bunk pass because of his condition of flat feet, but this provides no evidence that Wexford maintained an unconstitutional policy or widespread practice that determined that people with his condition could never or would never receive bottom bunk passes. *See, e.g., Palmer v. Marion Cty.*, 327 F.3d 588, 597 (7th Cir. 2003) (holding that "a showing of isolated incidents does not

create a genuine issue as to whether defendants have a general policy or a widespread practice of unconstitutional nature").

No reasonable fact-finder could conclude that Mr. Crittenden has submitted evidence of any identifiable Wexford policies or practices that are sufficient to support his *Monell* claim. Accordingly, Wexford is entitled to summary judgment.

### IV. Conclusion

For these reasons, the defendants' motion for summary judgment, dkt. [150], is **granted.**

Defendants Michael Smith, M. Strobel, and Jennifer French have previously been dismissed from this action.

The Court now enters summary judgment in favor of Stacey Scott, Dr. Carl Kuenzli, Dr. Ippel, Heather Davis, and Wexford.

The **clerk is directed** to enter final judgment consistent with this Order and dockets 180 and 183.

**SO ORDERED.**

Date: 11/16/2020

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

LAMARR T. CRITTENDEN
148648
NEW CASTLE - CF
NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
1000 Van Nuys Road
NEW CASTLE, IN 47362

Courtney Lyn Abshire
courtney.abshire@atg.in.gov

Douglass R. Bitner
KATZ  KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Adam Garth Forrest
BBFCS ATTORNEYS
aforrest@bbfcslaw.com

Vivek Randle Hadley
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
vhadley@taftlaw.com

Ann O. McCready
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
amccready@taftlaw.com

Mollie Ann Slinker
INDIANA ATTORNEY GENERAL
mollie.slinker@atg.in.gov